91 So.2d 8

**Succession of George ANDERSON.**

No. 42509.

Nov. 5, 1956.

Spedale & Cooley, David E. Cooley, Baton Rouge, for appellants.

Richard Kilbourne, Clinton, for appellee.

FOURNET, Chief Justice.

The plaintiffs, Mrs. Doris Anderson Maggio and Mrs. Rae Anderson Vallery,[1] are appealing from a judgment dismissing their alternative demand[2] against their brother, Robert Lee Anderson, for collation alleged-

---

1. The suit was originally filed by the three sisters against their brother; as to the third sister, Mrs. Nellie Anderson Naul, the suit was dismissed on her own motion before trial.

2. Their main demand, to have the two deeds set aside on the ground that they were donations in disguise, was abandoned at the beginning of the trial.

3. George Anderson died October 5, 1954, leaving surviving him his widow, Mrs. Myrtice Whittaker, the three plaintiffs and the defendant. At the time this suit was filed the succession had been opened, but had progressed no further. Suit was filed on October 22, 1954.

ly due because of advantages which their father, George Anderson,[3] bestowed upon the defendant in two certain sales of real estate in the Parish of East Feliciana at a very low price—one, by deed of February 2, 1940, where he conveyed 20 acres of land of the value of $1,000 for $100, and the other, by deed of March 3, 1949, where he conveyed 565 acres of land, of the value of $56,500, for a recited consideration of $12,000, represented by a note payable in annual installments of $1,500 each.

The record shows that the defendant bought the 20 acre tract in 1940 and built his home thereon; and that he began negotiations with his father for the purchase of the 565 acre farm in 1944 or 1945. Due to the shortage of labor during the war years, that acreage had fallen into a condition of neglect, to the extent that the open land, usually farmed or used as pasture land, had grown up in briars, there were washouts, and fences were broken or destroyed. In December of 1945 the defendant and his father came to an agreement that the defendant would buy the place; but inasmuch as he did not have enough money to purchase equipment and also make a down payment, it was agreed that he would take over the place and start the work of clearing and putting it in good condition, until such time as his financial condition improved. Acting on that understanding, the defendant quit his job with Standard Oil Company in February, 1946, and took complete charge of the farm. He began the work of clearing and improving it, built fences and started farming portions of the land. In conversation between the defendant and his father about the price he would pay for the farm, the defendant was informed of an offer to purchase the place for $30,000—which offer was declined by the father because of the previous negotiations that had taken place between him and his son. Since the defendant did not wish to be burdened with the interest on a large unpaid balance, it was agreed between him and his father, a large portion of the value of the property being in timber, that the timber should be sold and the purchase price reduced accordingly. Thereupon, through defendant's efforts, $3,260 was received for some of the timber and later, on November 2, 1948, $12,000 worth of timber was sold. Approximately four months afterward the sale to the defendant was consummated; and although the deed recites a consideration of $12,000, actually, as the record shows, $2,000 more was paid, and that in cash, on the day of the sale, and was divided by the father among his four children. When this suit was filed the open or farming land was in excellent condition, and the whole property gave evidence of care. A barn had been built, the soil had been improved, stumps had been removed, fences had been constructed, washouts and

erosion had been corrected, and the land had been cleared and cleaned.

■ 'Collation is the return to a succession of property which was received by a descendant heir "in advance of his share or otherwise," in order that such property may be divided along with the remainder of the succession mass. The purpose of collation is to secure equality among children and other lawful descendants who divide among them the succession of their ancestor; and the obligation of collating comes about because of the presumption, unless expressly negated, that what was given by the ancestor to the descendants was intended merely as an advance of what they might one day inherit from his succession. Articles 1227, 1229, Louisiana Civil Code, LSA. "The advantage which a father bestows upon his son, though in any other manner than by donation or legacy, is likewise subject to collation. Thus, when a father has sold a thing to his son at a very low price, * * *." Article 1248, Louisiana Civil Code, LSA.

■ The question for our consideration on this appeal therefore is: What constitutes a "very low price"?

This Court held in the early case of Montgomery v. Chaney, 13 La.Ann. 207, that "where there is a price actually paid exceeding one-fourth of the value of the property sold, but much below its fair val-

ue," the law compels the purchaser-forced heir to collate. The value must be "proved with reasonable clearness and certainty." See, also, Bossier v. Vienne, 12 Mart., O.S., 421; Succession of Lamotte, 110 La. 42, 34 So. 122; Gonsoulin v. Gonsoulin, 132 La. 737, 61 So. 774; Steen v. Louisiana Cent. Lbr. Co., 2 La.App. 39; Berthelote v. Berthelote, La.App., 24 So.2d 191. And, as pointed out in the case of Taylor v. Brown, 223 La. 641, 66 So.2d 578, the criterion by which we are to be guided in deciding whether a property has been sold much below its fair value is the price the property would have brought if placed for sale on the market at the time of the transfer.

The trial judge, who knows the parties to this suit as well as the properties which were sold to the defendant, resolved the issue of proof against the plaintiffs, and after a careful study of the record we are convinced of the correctness of his conclusion.

The only evidence offered by the plaintiffs in support of their contention that their brother received an advantage from their father in the sale of these two properties was the testimony of two experts from Baton Rouge, neither of whom had any knowledge of the condition of the properties at the time of the sales. They failed to introduce any evidence to establish the market value for comparable property, nor did they offer any evidence of sales of simi-

lar property that took place in the Parish of East Feliciana at the time of the sales to the defendant.

The first witness who testified for the plaintiff was Mr. John P. Brashear. According to his testimony he is a real estate broker whose occupation was appraising property and estimating timber, having had about 45 or 50 years' experience. He estimated the value of the 565 acre tract, in 1949, at $30,250. In arriving at that estimate he placed a value of $80 an acre on 200 acres fronting on the Plank Road, $50 an acre on 165 acres fronting on the State road, and $30 per acre for the remaining acreage which is without frontage on any road. He also estimated the 20 acre tract, purchased in 1940, at $30 an acre.

Clearly, this witness' appraisals were mere conclusions without basis therefor. While he did venture the opinion that because a large segment of the land fronts on Plank Road, it could be cut into small tracts and used for residential or commercial purposes, that opinion was not based on any established market value for such properties at the time of the sales in question, nor did the plaintiffs show that there was such a market in existence. Consequently, the witness' testimony as to the value of this farm land, most of which was cut over timber land, is of very little probative worth. The same may be said of

his valuation of the 20 acre tract purchased by the defendant in 1940. The witness estimated from a glance at the property from the road, fifteen years after the sale took place, without any knowledge of the condition in which it was at the time of the purchase, and without any other basis for his opinion, that in 1940 it had a value of $30 an acre.

The other witness, Mr. R. D. Percy, a civil engineer doing business as a consulting engineer, testified he was born in the Parish of East Feliciana, had been reared there, owned property adjoining the land in controversy, and has had some experience with the appraisal of building sites as well as appraisal work for the Highway Commission. Like Mr. Brashear, he testified he had no knowledge of the condition of the subject property in 1949, but as he found the properties to be immediately before trial, upon a casual inspection, and upon his assumption that they were in 1949, about as they are now, he estimated the portion that was cut over timber (approximately 277 acres) to have a value of $25 an acre, and the remainder (approximately 288 acres) to have a value of $100 per acre. However, on cross examination he admitted that if the open pasture land were grown up in briar bushes, gum sprouts, and broom sage, "I would probably have reduced that by an amount that I considered would be a fair cost to improve the pasture

land to first class condition." He admitted his appraisal was based on the fact that the land was in first class condition when he saw it. The record clearly shows that at the time the defendant acquired the acreage, the property had been neglected for a number of years; the fences were down, the open land was covered with briar bushes, gum sprouts, broom sage, and littered with pine stumps which had never been removed; and that to clear land in such condition is very expensive. This witness not only knew of no market value for comparable land in the Parish, but he knew of no sale of land that had taken place during the period. Obviously this testimony is of no value in establishing the fair market value of the property at the time it was purchased by the defendant in 1949. The same can be said of this witness' opinion of the value of the 20 acre tract when it was purchased by the defendant in 1940. He testified that he sat on the road and observed this property in the condition in which it is today, well improved and cared for; and without any knowledge whatsoever of its condition at the time of the acquisition by defendant, or any knowledge of market value for such property at that time, and without any other basis to support his estimate but his bare opinion, concluded that the property was worth $40 an acre. Moreover, it is apt to observe that this witness, in the year 1948 when appraising comparable property located in the immediate vicinity to that involved here, under oath fixed its value at $20 per acre.

We think that this record shows that the decedent, George Anderson, was a successful farmer and business man, who had accumulated considerable property and other wordly goods during his life time; and that he was very devoted to his family. The record also reveals that the decedent was a very honorable man and in dealing with his children was scrupulously fair. Periodically he divided large sums of money among them, always in equal portions; and while it is also clear that he wanted his son to have the particular farm in controversy, we are impressed with the fact that he did not intend to favor him over his other children. He frankly stated to his son that he had been offered $30,000 for the property with the timber, and we think this is the only market value ever established in the record for the 565 acre farm. Naturally, when the timber was removed, the value of the property decreased accordingly. Consequently when the sale took place for $14,000 ($2,000 of which was divided among the children), that was a fair price for the land.

We are fortified in this view by the testimony of the neighboring farmers who appeared as witnesses for the defendant; they not only knew the condition of the

property at the time of the sale but certainly are in a better position to know the value of farm lands than the so-called experts who testified in this case.

Counsel in his brief, pointing out that the experts Brashear and Percy had appraised the 20 acre tract at $30 and $40 respectively, and that "The only evidence offered by defendant as to the value of this tract is the testimony of defendant himself, who compared it with a sale made by his father to Edward Delee in the year 1936" at $20 per acre, declares "There can be no doubt that plaintiffs have established their claim with respect to the 20 acres sold by decedent in the year 1940 for the price of $100."

As previously shown, the testimony of the two experts has proved to have very little if any probative value in establishing the market value for comparable property in that year. They neither knew the condition of the property at the time, nor of any market for such property. The fact that an isolated sale of property in the vicinity at $20 per acre took place in 1936 does not establish a market value for property in the year 1940 any more than the sale in 1946 by decedent to his daughter of a parcel of land at $10.47 per acre establishes such a market value—the criterion being the price the property would have brought if placed for sale on the market at the time of the transfer. Taylor v. Brown, 223 La. 641, 66 So.2d 578.

For the reasons assigned, the judgment appealed from is affirmed; all costs to be paid by the plaintiffs.